# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS & ST. JOHN

| | |
|---|---|
| TAMMY KNIELING )<br><br>Plaintiff, )<br><br>VS. )<br><br>DON FUNG FOOK and WILLIAM J. POSTON, )<br><br>Defendants. ) | CIVIL NO. 2022-36 |

## <u>MEMORANDUM OPINION</u>

Plaintiff Tammy Knieling was injured when she was trying to let out a dinghy line on the vessel Somewhere Hot.  She brings this action against defendants for common law negligence and gross negligence, Jones Act negligence, unseaworthiness, and maintenance and cure.  A bench trial was held on June 3–6, 2024.  Following the trial, the parties submitted proposed findings of fact and conclusions of law to the Court.  The Court, having fully considered the evidence presented at trial, the arguments of counsel, and the applicable law, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## I.    FINDINGS OF FACT

### A. The Parties

### Tammy Knieling

1. Plaintiff Tammy Knieling has been around boats since she was a child, and used to work at a marina as a yacht general clerk.  Trial Tr. Day 1 [ECF 141] at 116 (Fook); Trial Tr. Day 2 [ECF 142] at 10 (Knieling).

2. Knieling started working as a chef on vessels in March 2020.  Trial Tr. Day 2 [ECF 142] at 10 (Knieling).  She also did stew and mate work, and deck hand lines.  Trial Tr. Day 2 [ECF 142]

at 13 (Knieling); Ex. 81a.[1]

3. Knieling came to the Virgin Islands in early 2021 to work as a chef on vessels.  Trial Tr. Day 2 [ECF 142] at 12 (Knieling).

4. Plaintiff worked four charters on the Somewhere Hot: July 2–9, 2021; July 11–16, 2021; July 27–August 30, 2021; and August 3–6, 2021.  *See* Exs. 36–39.  She left the boat on August 6 or 7, 2021.  Ex. 27; Trial Tr. Day 2 [ECF 142] at 67–68, 178 (Knieling).

5. After the Somewhere Hot, plaintiff worked as sole chef on three other vessels in 2021.  Trial Tr. Day 2 [ECF 142] at 70 (Knieling); *see* Ex. 81a.  She continued to work as a chef on vessels throughout 2022 and 2023.  *Id.*

6. Plaintiff did very well as a chef and received letters of recommendation from captains.  Trial Tr. Day 2 [ECF 142] at 70–71, 73 (Knieling).

7. Plaintiff was working as a sole chef on a vessel at the time of the bench trial in this matter.  Trial Tr. Day 2 [ECF 142] at 65 (Knieling).

8. Plaintiff is right-handed.  Trial Tr. Day 2 [ECF 142] at 127 (Knieling).

**Don Fung Fook**

9. Defendant Don Fung Fook has been a captain for 20 years and holds a 200-ton license.  Trial Tr. Day 1 [ECF 141] at 118–19 (Fook).

10. Fook started working for defendant Poston as the captain of the Somewhere Hot in 2019.  Trial Tr. Day 1 [ECF 141] at 45–46 (Fook).

11. Fook hired plaintiff to work as a chef and mate on the Somewhere Hot.  Trial Tr. Day 1 [ECF 141] at 115–16 (Fook); Trial Tr. Day 2 [ECF 142] at 14–15 (Knieling).

---

[1] All exhibits referenced herein are those admitted into evidence during trial.

### William Poston

12. Defendant William Poston purchased the M/V Somewhere Hot in 2019 and began running charters on the vessel in the Virgin Islands. Trial Tr. Day 1 [ECF 141] at 274, 317 (Poston).

13. Poston hired Captain Fook to manage all affairs related to the Somewhere Hot. Trial Tr. Day 1 [ECF 141] at 275 (Poston).

14. Poston delegates responsibility to Fook to hire, train, and pay the Somewhere Hot employees, and then Fook submits bills to Poston for reimbursement. Trial Tr. Day 1 [ECF 141] at 275 (Poston).

15. Fook paid the invoices he received from plaintiff, then submitted the bills to Poston for reimbursement. Trial Tr. Day 1 [ECF 141] at 46 (Fook).

16. Poston does not provide training to Fook on how to operate the Somewhere Hot or how to train other crew members. Trial Tr. Day 1 [ECF 141] at 47 (Fook); *id.* at 275, 286 (Poston).

**B. Plaintiff's Injury**

17. On July 3, 2021, plaintiff was working aboard the Somewhere Hot and defendant Fook was the captain. Trial Tr. Day 2 [ECF 142] at 23 (Knieling).

18. While exiting the mooring field at Honeymoon Bay on Water Island, Fook asked plaintiff to let out the dinghy line. Trial Tr. Day 1 [ECF 141] at 246 (Fook); Trial Tr. Day 2 [ECF 142] at 23–24 (Knieling).

19. Fook did not provide plaintiff with gloves to use when handling the lines on the boat. Trial Tr. Day 1 [ECF 141] at 56–57 (Fook).

20. Plaintiff tried to loosen the line and her left hand became entangled between the line and the cleat. Trial Tr. Day 2 [ECF 142] at 25, 28 (Knieling).

21. No one witnessed plaintiff's accident. Trial Tr. Day 2 [ECF 142] at 29 (Knieling).

22. After plaintiff yelled for help, Fook stopped the boat and plaintiff freed her hand.  Trial Tr. Day 1 [ECF 141] at 59 (Fook); Trial Tr. Day 2 [ECF 142] at 28 (Knieling).

23. Fook got the medical kit and Gabriella, a medical student and guest onboard the vessel, cleaned plaintiff's injury and wrapped her left middle finger in a compression wrap.  Trial Tr. Day 1 [ECF 141] at 49 (Fook); Trial Tr. Day 2 [ECF 142] at 28 (Knieling).

24. Fook asked plaintiff if she wanted to go ashore for medical treatment.  Trial Tr. Day 1 [ECF 141] at 64, 124, 270 (Fook).

25. Plaintiff stayed on the boat and continued with the trip.  Trial Tr. Day 1 [ECF 141] at 64, 124–25, 270 (Fook); Trial Tr. Day 2 [ECF 142] at 32 (Knieling).

26. Fook and the charter guests helped plaintiff with food prep, setting the table, and dishes, and the guests helped let out the dinghy line.  Trial Tr. Day 1 [ECF 141] at 112–13 (Fook); Trial Tr. Day 2 [ECF 142] at 44, 107 (Knieling).

27. Plaintiff did not ask Fook for any time off to heal from her injury, and did not ask Fook if she would still be paid if she took time off.  Trial Tr. Day 1 [ECF 141] at 111, 151 (Fook).

28. Fook did not tell plaintiff that he or defendant Poston would cover plaintiff's living expenses if she left the boat to treat her injury.  Trial Tr. Day 1 [ECF 141] at 245 (Fook); Trial Tr. Day 2 [ECF 142] at 40 (Knieling).

29. Plaintiff did not miss any days of work on the Somewhere Hot between the time she was injured and the date she left the vessel.  Trial Tr. Day 2 [ECF 142] at 127 (Knieling).

30. During her last trip on the Somewhere Hot, plaintiff did not receive any help with her chef or mate duties from the captain or guests.  Trial Tr. Day 2 [ECF 142] at 139–41 (Peterman); *id.* at 155–57 (Voris).

31. There are no regulations or statutes that outline the duties related to letting out a line on a

dinghy.  Trial Tr. Day 3 [ECF 143] at 31 (Stoller).

## C.  Plaintiff's Medical Treatment

### 2021

32. On July 5, 2021, plaintiff emailed Red Hook and Yacht Haven Family Practices and made an

appointment for July 9, 2021, the last day of the charter.  Ex. 44; Trial Tr. Day 2 [ECF 142] at

34–35 (Knieling).

33. Plaintiff went to Red Hook and Yacht Haven Family Practices on July 9, 2021.  The doctor

advised her to go to Schneider Regional Medical Center ("SRMC") for same day evaluation

and treatment.  Ex. 48.

34. Plaintiff went to the emergency department at SRMC on July 9, 2021.  Ex. 46.  Diagnosis on

discharge was right third finger paronychia,[2] and left third finger avulsion fracture and

laceration.  She received pain medication and antibiotics, and was instructed to wear a finger

immobilizer, keep her fingers dry and not submerge in water, rest and elevate her hand, and

follow-up with Dr. Bacot.  Ex. 46; Trial Tr. Day 2 [ECF 142] at 43 (Knieling).

35. Plaintiff left SRMC and returned to the vessel that night.  Ex. 11; Trial Tr. Day 2 [ECF 142] at

39 (Knieling).

36. Plaintiff saw Dr. Bacot at Comprehensive Orthopedic Global ("COG") on July 19, 2021.  Ex.

55.  He ordered occupational therapy ("OT"), 3 times per week for 4 weeks, and requested

plaintiff be given home exercises because she lived on a boat.  *Id.*; Trial Tr. Day 2 [ECF 142]

at 46 (Knieling).

37. Plaintiff had an initial OT evaluation at Synergy Fitness and Wellness Center ("Synergy") on

---

[2] An infection near the fingernail.  Trial Tr. Day 1 [ECF 141] at 170 (Fletcher).

July 22, 2021.  Ex. 54 at 2.  She reported limited strength and movement in her left middle finger resulting in inability to complete job requirements of being a chef.  *Id.*  On exam, she could not obtain full flexion of her left middle finger in the PIP or DIP joints and could not make a full fist.  *Id.*  Power grip was 64.8 pounds with the right hand, and 14.8 pounds with the left hand.  *Id.* at 3.  Plaintiff's long-term goal (4 weeks) was to increase her grip strength to her prior level of functioning to be able to complete work tasks.  *Id.*  The therapy plan was once a week for four weeks, and the therapist provided a home exercise program.  *Id.* at 4.

38. At a second OT appointment on September 23, 2021, plaintiff reported difficulty with picking up items and moving them, opening the fridge, and lifting pans.  Ex. 54 at 7.  She demonstrated increased flexion but continued to present with limited range of motion; power grip was 50.2 pounds right and 19 pounds left.  *Id.* at 8, 10.  The therapist noted plaintiff had made good progress with her HEP and gave her additional exercises.  *Id.* at 8.  The therapist told plaintiff to stop wearing the compression wrap because she no longer needed it.  Trial Tr. Day 2 [ECF 142] at 128 (Knieling).

39. Plaintiff has not attended any therapy appointments since September 2021.  Trial Tr. Day 2 [ECF 142] at 58 (Knieling).

**2022**

40. Plaintiff sought no medical treatment for her injury from September 2021 until October 2022.

41. On October 20, 2022, plaintiff saw Dr. Lovy at Holy Cross Medical Group and reported sharp pain in her finger and running up the neck.  Ex. 56.  Plaintiff stated her symptoms were worsening and that she had done OT and did hand range of motion exercises but had not regained the ability to make a full fist.  X-rays showed no fractures, dislocations, or arthritic changes, and no evidence of malrotation.  Dr. Lovy assessed left hand finger stiffness and

recommended ice 2–3 times per day for 2 weeks, OTC medication for pain and inflammation, and OT, and noted "pain will not resolve without regaining range of motion."

## 2023

42. Dr. Fletcher is a plastic and hand surgeon. Trial Tr. Day 1 [ECF 141] at 158 (Fletcher). He is board certified in plastic and reconstructive surgery, and board certified in orthopedic surgery with a specialty in hand surgery. Trial Tr. Day 1 [ECF 141] at 161 (Fletcher).

43. The Court accepted Dr. Fletcher as a medical expert at trial. Trial Tr. Day 1 [ECF 141] at 163.

44. Dr. Fletcher first saw plaintiff on January 31, 2023. Ex. 64 at 149. She complained of pain and decreased range of motion. Trial Tr. Day 1 [ECF 141] at 170 (Fletcher). He found she could not make a fully closed fist, *id.*, and he ordered an MRI. Ex. 58. The impression was no fracture or fracture deformity, and mild chronic third PIP joint sprain. Ex. 60.

45. On February 21, 2023, plaintiff continued to complain of the same stiffness, and discomfort in the tip of her finger. Ex. 64 at 151. Dr. Fletcher stated, "plaintiff concurs that she would like to improve the symptoms and the cosmetic appearance," and recommended the following: 1) laser to improve pigmentation, $4–$6,000 per session; 2) cortisone injections to improve quality of the scar, $1,200 per injection; 3) hand therapy, $4–$6,000; and 4) PRP injections, $2,500 per injection.[3] Ex. 64 at 152.

46. Dr. Fletcher recommended these treatments to improve plaintiff's symptoms of pain and range of motion to better her function, and to improve the cosmetic appearance of her finger. Trial Tr. Day 1 [ECF 141] at 187, 189, 233–34 (Fletcher).

47. On February 21, 2023, Dr. Fletcher prescribed Lidoderm patches to be applied once per day

---

[3] At a March 16, 2023 appointment, Dr. Fletcher stated PRP injections might improve the scar tissue and would cost $3,000 per injection. Ex. 64 at 211–12.

for 30 days.  Ex. 63; *see* Ex. 65.

48. On March 16, 2023, plaintiff continued to report pain and discomfort with grip and ROM.  Ex. 64 at 211.  Dr. Fletcher documented ROM from 10 degrees to 80 degrees with some limitation of ROM due to pain; swelling in the joint; and pain with palpation.  *Id.*  His impression was pain and loss of ROM due to hand injury at the PIP of the left long digit, and he recommended plaintiff continue ROM exercises at home and return in a few months to revisit treatment options.  *Id.* at 211–12.  Plaintiff received a joint injection the same date.  Ex. 66.

49. Dr. Fletcher last saw plaintiff on May 2, 2023.  Ex. 64 at 216.  He observed no change in her range of motion, and noted her injury had healed but that she continued to be bothered by pain with ROM and discomfort.  The plan was for plaintiff to attend PT/OT and then return to the clinic.  *Id.*; *see* Ex. 67.

50. Plaintiff's original fracture from the July 3, 2021 injury is healed.  Trial Tr. Day 1 [ECF 141] at 182 (Fletcher).

51. Plaintiff's injury has a permanent nature and cannot be returned to its pre-injury condition; she will always have some pain and will never regain full range of motion.  Trial Tr. Day 1 [ECF 141] at 200–01, 205, 211 (Fletcher).

52. Dr. Fletcher did not tell plaintiff to stop working as a chef, and did not opine to any work restrictions.  Trial Tr. Day 1 [ECF 141] at 223, 225 (Fletcher).

53. There is no medical opinion as to whether plaintiff has reached maximum medical improvement ("MMI") as of the time of trial.  Trial Tr. Day 1 [ECF 141] at 226 (Fletcher).

**D. Plaintiff's Maintenance and Cure Demands**

54. Plaintiff sent Fook invoices requesting payment for her compensation and other charter expenses, and for her medical bills.  *See* Exs. 36–41.

55. Fook sent payments to plaintiff, but the payments did not correspond to the invoice amounts. Ex. 80; Trial Tr. Day 1 [ECF 141] at 91–92 (Fook).

56. Fook told plaintiff he would reimburse her for her medical expenses.  Trial Tr. Day 1 [ECF 141] at 62–63 (Fook).

57. On September 23, 2021, Attorney Gilzean of Latti & Anderson LLP sent a letter to defendant Poston stating plaintiff had retained counsel for her injuries on the Somewhere Hot, and that "request is made for the payment of maintenance and cure."  Ex. 69.

58. On October 6, 2021, Latti & Anderson LLP sent an email to Poston and Fook requesting payment of plaintiff's outstanding medical bills and demanding maintenance at the rate of $91.30/day retroactive to September 1, 2021.  Ex. 70.  The email purported to attach bills for SRMC for $1,560.92 and COG for $34, and requested plaintiff be reimbursed $150 for a payment made to her physical therapist.

59. On October 13, 2021, Latti & Anderson LLP sent a follow-up email to Poston and Fook, attaching records from Synergy and stating maintenance payments were "desperately needed." Ex. 71.

60. On December 9, 2021, Attorney Gilzean sent a maintenance and cure demand to Poston's counsel, Attorney Walsh, seeking $1,744.92 for plaintiff's outstanding medical bills.  Ex. 87. The letter requested immediate payment, stating plaintiff had "gone over three months without any income or maintenance payments" and "[h]er situation is getting desperate."

61. On January 19, 2022, Attorney Walsh sent a letter to Attorney Gilzean.  Ex. 72.  Defendants stated they had covered plaintiff's medical expenses after her injury.  They disputed her claim for maintenance because she had returned to her duties on the Somewhere Hot and then worked for another vessel, and thus appeared to be at maximum medical recovery.  Defendants offered

to pay plaintiff $2000 to cover any outstanding medical bills. Trial Tr. Day 1 [ECF 141] at 295–96 (Poston).

62. On June 2, 2023, plaintiff's current counsel, Attorney Fischer, sent to defendants' counsel another maintenance and cure demand. Ex. 76. The letter alleged defendants provided no benefits to plaintiff after her injury, and further claimed plaintiff was "being forced back into the service of a vessel" due to defendants' non-payment. The letter purported to attach records from Dr. Fletcher and other outstanding bills and requested outstanding maintenance totaling $58,340.70.

63. On June 27, 2023, defense counsel responded to Attorney Fischer's letter and disputed plaintiff's claim for maintenance based on defendants' conclusion that, in light of her return to work, plaintiff had achieved maximum medical cure sometime in August or September of 2021. Ex. 77; Trial Tr. Day 1 [ECF 141] at 303–04 (Poston). Defendants further noted that when plaintiff's previous counsel, Attorney Greene, filed this suit, he only alleged a claim for negligence and did not include a claim for maintenance and cure. Ex. 77; Trial Tr. Day 1 [ECF 141] at 305 (Poston). Defendants offered to pay $2,750 to cover any outstanding medical bills. Ex. 77.

**E. Outstanding Medical Bills**

64. The SRMC bill for $1,560.92 has not been paid. Ex. 45; Trial Tr. Day 1 [ECF 141] at 66 (Fook); *id.* at 279, 292 (Poston); Trial Tr. Day 2 [ECF 142] at 51 (Knieling).

65. Plaintiff has not been reimbursed $150 for a Synergy bill. Trial Tr. Day 1 [ECF 141] at 279, 292 (Poston).

66. The COG bill for $34.00 has not been paid. Ex. 49; Trial Tr. Day 1 [ECF 141] at 66 (Fook); *id.* at 279, 292 (Poston); Trial Tr. Day 2 [ECF 142] at 51 (Knieling).

67. Plaintiff has not been reimbursed $336.50 for the Holy Cross bill.  Ex. 57; Trial Tr. Day 1 [ECF 141] at 307 (Poston).

68. The MRI bill for $1,600.00 has not been paid.  Ex. 62; Trial Tr. Day 1 [ECF 141] at 307 (Poston).

69. The Vanguard Plastic Surgery bill for $5,650.00 has not been paid.  Ex. 68; Trial Tr. Day 1 [ECF 141] at 307 (Poston).

70. Plaintiff has not been reimbursed $267.99 for the Lidocaine patches.  Ex. 65; Trial Tr. Day 1 [ECF 141] at 307 (Poston).

## II.    CONCLUSIONS OF LAW

### A. Jurisdiction

The Court has jurisdiction over this admiralty and maritime case pursuant to 28 U.S.C. § 1333(1).[4]  The general maritime law of the United States is the substantive law applicable to this dispute.  *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986).

### B. Negligence and Gross Negligence

Plaintiff cannot bring a claim for negligence or gross negligence against defendant Poston as her employer or against defendant Fook as her coworker/master under either the common law or general maritime law.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 26, 29 (1990) ("the Jones Act establishes a uniform system of seamen's tort law" and "pre-empts state law remedies for the death or injury of a seaman"); *McAleer v. Smith*, 57 F.3d 109, 116 (1st Cir. 1995) ("seamen have no general maritime cause of action for injuries caused by the negligence of the master or crew"); *see also California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 833 (9th Cir. 1989) (Jones Act does

---

[4] Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."

"not provide the seaman with a right of action against a fellow employee for negligence").

## C. The Jones Act

  i.  Legal Standards

The Jones Act creates a cause of action for a seaman injured in the course of his employment because of the negligence of the seaman's employer, or the employer's officers, agents, or other employees.  46 U.S.C. § 30104; *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 415 (2009); *Hopson v. Texaco, Inc.*, 383 U.S. 262, 263 (1966); *see also Herrera v. 7R Charter Ltd.*, 2018 WL 7825023, at *2 (S.D. Fla. Apr. 30, 2018) (Jones Act "allows seamen to recover damages from their employers . . . , even if a fellow crewmember was at fault for [seaman's] injuries").  To prevail on her Jones Act claim, plaintiff must prove by a preponderance of the evidence: "(1) that [s]he is a seaman under the Act; (2) that [s]he suffered injury in the course of h[er] employment; (3) that h[er] employer was negligent; and (4) that h[er] employer's negligence caused h[er] injury at least in part."  *Diefenbach v. M/V Eagle Ray*, 2017 WL 1234135, at *2 (D.V.I. Mar. 31, 2017) (citation omitted).

Determining seaman status "is a mixed question of law and fact."  *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995); *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993).  "[T]he essential requirements for seaman status are twofold.  First, . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission.  Second, . . . a seaman must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature."  *Chandris*, 515 U.S. at 368 (internal quotations and citations omitted).  To recover under the Jones Act, a plaintiff-seaman must also establish an employer-employee relationship with the defendant.  *See Armit v. Loveland*, 115 F.2d 308, 313 (3d Cir. 1940); *Haskins v. Point Towing Co.*, 421 F.2d 532, 536 (3d Cir. 1970); *Evans*, 4 F.3d at 215.  "The existence of the

employment relationship is a question of fact, and the inquiry turns on the degree of control the alleged employer exerts over the employee." *Reeves v. Mobile Dredging & Pumping Co.*, 26 F.3d 1247, 1253 (3d Cir. 1994). "[F]actors demonstrating control include payment, direction, supervision, and discretion to hire and fire." *Id.* n.9; *see Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 795 (1949).

The standard of care for both seaman and shipowner under the Jones Act is the same as that required under ordinary negligence: ordinary prudence under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338–39 (5th Cir. 1997) (citing *Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1283 (3d Cir. 1995)). "An employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear." *Simmons v. Transocean Offshore Deepwater Drilling, Inc.*, 551 F. Supp. 2d 471, 475 (E.D. La. 2008); *Clements v. Chotin Transp., Inc.*, 496 F. Supp. 163, 165 (M.D. La. 1980) ("shipowner has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition"); *see also Semien v. Parker Drilling Offshore USA LLC*, 179 F. Supp. 3d 687, 694 (W.D. La. 2016) (negligence may arise from "failure to inspect the work place for hazards [or] failure to take precautions to protect a seaman"). "An employer is only liable under the Jones Act if the employer or its agents either *knew* or *should have known* of the dangerous condition." *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 663 (9th Cir. 1997); *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993) ("There must be some evidence from which the trier of fact can infer that the owner either knew, or in the exercise of due care, should have known of the unsafe condition."). "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989)

(citation omitted).

Negligence under the Jones Act is a cause of an injury if it played any part, no matter how slight, in bringing about the injury or damage, even if the negligence operated in combination with the acts of another, or in combination with some other cause. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011). Though the seaman's burden to prove causation is "featherweight," *Semien*, 179 F. Supp. 3d at 695, "the necessary causal connection requires more than simple 'but for' cause"; instead, "negligence must be 'a legal cause' of the [seaman's] injury." *Gavagan v. United States*, 955 F.2d 1016, 1019–20 (5th Cir. 1992) (citation omitted). Additionally, while "contributory negligence does not bar recovery under the Jones Act (or for unseaworthiness)," *Gavagan*, 955 F.2d at 1019, contributory negligence is "an affirmative defense that diminishes recovery in proportion to the seaman's fault" upon the employer's proof of negligence and causation. *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008).

A Jones Act plaintiff must prove his claim for damages by a preponderance of the evidence. *Evans v. United Arab Shipping Co. (S.A.G.)*, 790 F. Supp. 516, 519 (D.N.J. 1992), *aff'd*, 4 F.3d 207 (3d Cir. 1993). "Under the Jones Act and the general maritime law, an injured seaman is entitled to recover for past loss of wages, future loss of earning capacity, unpaid medical expenses, and future medical expenses, as well as pain and suffering resulting from an injury caused by negligence and/or unseaworthiness." *Weeks Marine, Inc. v. Watson*, 190 F. Supp. 3d 588, 596 (E.D. La. 2016); *see also Butwinski v. Pennsylvania R Co*, 249 F.2d 644, 645 (2d Cir. 1957) ("Recovery of medical expense in a Jones Act case is not prohibited as long as plaintiff is not permitted an additional recovery for the same expenses under a count for maintenance and cure."). "The injured seaman is also entitled to compensation . . . for the physical and mental effects of the injury on his ability to engage in those activities which normally contribute to the enjoyment of

life." *Downie v. U.S. Lines Co.*, 359 F.2d 344, 347, n.3 (3d Cir. 1966) ("Examples of provable elements are: inability to dance, bowl, swim or engage in similar recreational activities; inability to perform customary household chores; and, inability to engage in the usual family activities."); *see Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 121 (1st Cir. 2016) (non-economic damages cannot be determined by a precise formula, and depend upon the evidence presented in each case). Importantly, "the Jones Act 'limits recovery to pecuniary loss,' . . . [and] the Federal Courts of Appeals have uniformly held that punitive damages are not available under the Jones Act." *The Dutra Grp. v. Batterton*, 588 U.S. 358, 373 (2019) (citation omitted).

Further, "[a]ccording to the general 'American Rule' applied in admiralty cases, attorneys' fees are not awarded to the prevailing party as a matter of course." *Cianbro Corp. v. George H. Dean, Inc.*, 733 F. Supp. 2d 191, 194 (D. Me. 2010). Attorneys' fees are only available if: "(1) a federal statute governing the claim provides for them; (2) a contract provides for them; or (3) the party to be sanctioned has acted in bad faith." *Id.*; *Golden Pisces, Inc. v. Fred Wahl Marine Const., Inc.*, 495 F.3d 1078, 1081 (9th Cir. 2007) (same).

ii.   <u>Analysis</u>

At the time of her injury, plaintiff was a seaman working aboard the M/V Somewhere Hot in furtherance of its mission.

Poston was plaintiff's Jones Act employer and had a duty to provide her with a safe place to work. Further, as plaintiff's Jones Act employer, Poston is vicariously liable for the negligence of his agent, Captain Fook.

Defendants were not negligent under the Jones Act for failing to outfit the Somewhere Hot with gloves to use when handling lines, or for failing to provide gloves to plaintiff to do the same. There is no applicable law or safety regulation requiring the use of gloves under the circumstances

presented.  Letting out a dinghy line is a routine task performed regularly on vessels without incident, and the Court agrees with Captain Richter's opinion that while wearing gloves might have made the task safer, the lack of gloves did not render the method of work inherently dangerous.  Thus, the standard of care does not require gloves here, and plaintiff did not meet her burden to show that it was negligent not to have gloves.

Plaintiff also has not proved that Fook failed to properly instruct her.  The Court does not find it credible that Fook never explained or demonstrated to plaintiff how to let out the dinghy line, and plaintiff in fact performed this task successfully on the first day of the charter.

The Court finds that Captain Fook was negligent under the Jones Act because of the speed that he was operating the boat at the moment he instructed plaintiff to let out the dinghy line. Plaintiff's expert opined as to a safer way to operate the vessel when instructing a crew member to let out the dinghy line that would avoid placing the line under too much tension or strain, and opined that the vessel should not be moving at all.  Trial Tr. Day 3 [ECF 143] at 14–17 (Stoller).[5] He explained that the risk of letting out a line that is under strain is that a person's hand could be trapped between the line and the cleat, and fingers could be cut off.  Trial Tr. Day 3 [ECF 143] at 13–14 (Stoller).  Captain Stoller stated that there has to be some strain on the line to let out the dinghy, but that excessive speed creates tighter tension on the line.  Trial Tr. Day 3 [ECF 143] at 43–44 (Stoller).  He opined that anything over 0.5 knots bare steerageway would be excessive. Trial Tr. Day 3 [ECF 143] at 45 (Stoller).

---

[5] Captain Mitch Stoller is a U.S. Coast Guard licensed captain with a master mariner's license.  Trial Tr. Day 3 [ECF 143] at 5 (Stoller).  The Court accepted Captain Stoller as an expert at trial in marine policy operations and practice, safety regulations, risk assessment, training, customs and practices, line handling operations, and standards of care for vessel operations.  Trial Tr. Day 3 [ECF 143] at 9–10.

*Knieling v. Fook et al.*
Civil No. 2022-36
Page 17

Defendants' expert opined that 4 knots or less would not be excessive for the task, and that Captain Fook was not required to stop the vessel. Trial Tr. Day 3 [ECF 143] at 60, 84 (Richter).[6] Captain Richer stated that at over 4 knots, the strain on the line would increase to a level where it is not as safe. Trial Tr. Day 3 [ECF 143] at 60 (Richter). He agreed that if Captain Fook had stopped the vessel in the way Captain Stoller described, it would take the strain off the line, and reducing or eliminating strain on the line would reduce the chance of injury. Trial Tr. Day 3 [ECF 143] at 77–79 (Richter).

While the Court makes no finding that the vessel was on plane at the time of the incident, there is no dispute that the vessel was in motion when Captain Fook instructed plaintiff to let out the dinghy line. Based on the evidence and testimony at trial, it is more probable than not that the vessel was traveling at a speed in excess of what would be considered safe for this task.[7] The vessel was traveling fast enough to create enough tension on the line such that plaintiff was unable to free her hand when it became trapped between the line and the cleat, thus causing her injury. Fook knew that it could be dangerous to let out the line if the vessel was moving too quickly because there would be too much pressure on the line and a person wouldn't be able to control it. *See* Trial Tr. Day 1 [ECF 141] at 109–11 (Fook). As an experienced captain, Fook should have known that the boat was moving too fast under the circumstances, and that it was unsafe for plaintiff to let out the dinghy line at that moment. Directing plaintiff to do so when the vessel was

---

[6] Captain Stephen Richter is a U.S. Coast Guard licensed captain with a master mariner's license and with a towing endorsement. Trial Tr. Day 3 [ECF 143] at 51–52 (Richter). The Court accepted Captain Richter as an expert at trial in the standard of care, line handling operations, custom and practice, training, risk assessment, safety regulations, and operation and procedures. Trial Tr. Day 3 [ECF 143] at 55–56.

[7] Fook was not asked the speed of the vessel at the time of plaintiff's injury. He testified generally that there is "not much of a tension" on the line when the vessel is underway because you are traveling at less than 4 knots. Trial Tr. Day 1 [ECF 141] at 49 (Fook).

*Knieling v. Fook et al.*
Civil No. 2022-36
Page 18

moving faster than it should have been placed plaintiff at an unreasonable risk of harm. Thus, Fook did not act with reasonable care under the circumstances when he instructed plaintiff to let out the line while the vessel was moving at a speed unsafe for this task. Accordingly, the Court finds that plaintiff has met her burden to prove negligence, and that defendants' negligence was a legal cause of plaintiff's injury. Defendant Poston is therefore liable under the Jones Act.[8]

Defendants have not proved that any negligence by plaintiff contributed to the cause of her injury. Though defendants attempt to argue that plaintiff delayed following Fook's instruction and did not start to let out the dinghy line until after the vessel exited the mooring field, the evidence on this point is far from clear. Moreover, it does not change the Court's conclusion that negligence occurred here because Fook instructed plaintiff to let out the dinghy line while he was operating the vessel at a speed unsafe for that task.

As to damages on this claim, plaintiff presented no evidence of past lost wages or any impairment in her future earning capacity. Plaintiff did not show that she missed any days of work, or turned down any jobs, or took any time off from working because of her injury. She also did not show that she is unable to work in the future, and in fact has continued to work in her chosen profession and received commendations for her work. The Court will award plaintiff damages for her incurred medical expenses that have not previously been paid or reimbursed by defendants. Past unpaid medical expenses total $9,599.41. The Court will not make any award for future medical expenses because plaintiff has not shown that she intends to schedule or undergo any future treatments. Additionally, plaintiff did not sufficiently show the cost for any future

---

[8] *See, e.g.*, *Marvin v. Cent. Gulf Lines, Inc.*, 554 F.2d 1295, 1298–99 (5th Cir. 1977) (collecting cases allowing recovery to seaman injured by sudden movement of line, where seaman was able to present some evidence supporting theory of negligence by employee for whose actions employer was liable).

*Knieling v. Fook et al.*
Civil No. 2022-36
Page 19

treatment.[9]  The Court will award $25,000.00 for past and future pain and suffering.  The Court

recognizes the mental anguish and physical discomfort plaintiff has suffered because of her injury,

and that these have affected her enjoyment of life.  Finally, there has been no showing of any bad

faith by defendants that would warrant an award of attorney's fees on this claim.

## D.  Unseaworthiness

    i.   <u>Legal Standards</u>

    "Independent from a claim under the Jones Act, a seaman has a claim for injuries caused

by the unseaworthiness of a vessel under general maritime law." *Fluker v. Manson Gulf, LLC*, 193

F. Supp. 3d 668, 675 (E.D. La. 2016).  "The doctrine of unseaworthiness [] imposes on a shipowner

a nondelegable duty to provide seamen a vessel that is reasonably fit for its purpose; it is a 'species

of liability without fault.'"  *Calhoun v. Yamaha Motor Corp.*, 40 F.3d 622, 631 (3d Cir. 1994)

(citation omitted), *aff'd*, 516 U.S. 199 (1996).

> To establish a claim of unseaworthiness, the injured seaman must
> prove that the owner has failed to provide a vessel, including her
> equipment and crew, which is reasonably fit and safe for the
> purposes for which it is to be used.  This standard does not require
> that the vessel and equipment be perfect, but rather that they be
> reasonably suited for their purposes.  In addition, the plaintiff must
> establish that the unseaworthy condition played a substantial part in
> bringing about or actually causing the injury and that the injury was
> either a direct result or a reasonably probable consequence of the
> unseaworthiness.

*Diefenbach*, 2017 WL 1234135, at *2 (quoting *Mayne v. Omega Protein Inc.*, 370 F. App'x 510,

515 (5th Cir. 2010)); *see also Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir. 1983)

("standard required to prove causation as a result of the vessel's unseaworthiness is more

---

[9] Dr. Fletcher provided an estimated cost for laser of $4,000–$6,000 per session but did not indicate how many sessions plaintiff would require.  Ex. 64.  He estimated PRP injections would cost $2,500–$3,000 per injection, and cortisone injections would cost $1,200 per injection, but he also did not indicate how many injections plaintiff needed.

demanding than that for recovery under the Jones Act"). "'A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman.' The owner is not obligated to furnish an 'accident-free' ship." *Patterson v. Omega Protein, Inc.*, 26 F. Supp. 3d 544, 547–48 (E.D. La. 2014) (citations omitted).

A vessel's unseaworthiness may arise from circumstances such as defective gear, appurtenances in disrepair, an unfit crew, an insufficient number of workers assigned to a task, or an improper method of work. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). "The mere existence of an alternative method of work or of alternative equipment, . . . [however], is insufficient of itself to render a vessel unseaworthy." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 303 (5th Cir. 1985). Moreover, a single isolated act of operational negligence does not render a vessel unseaworthy. *Usner*, 400 U.S. at 500. To hold otherwise "would be to subvert the fundamental distinction between unseaworthiness and negligence." *Id.* Stated another way, "unseaworthiness is a condition, not an act." *Edynak v. Atl. Shipping Inc. Cie. Chambon Maclovia S.A.*, 562 F.2d 215, 224 (3d Cir. 1977) ("an act occurs instantaneously, whereas there must be some period of time during which a condition exists," and "a condition necessarily consists of more than one act"); *see* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6:26 (6th ed. 2018) ("Unseaworthiness is fundamentally a defective *condition*, not the result of an isolated negligent act.").

Damages for unseaworthiness are the same as those available under the Jones Act, *Weeks Marine*, 190 F. Supp. 3d at 596, and the Supreme Court has specifically held that punitive damages are unavailable for an unseaworthiness claim. *Batterton*, 588 U.S. at 361.

ii.    <u>Analysis</u>

Plaintiff cannot bring a claim for unseaworthiness against defendant Fook. *Strom v. M/V*

*W. Dawn*, 698 F. Supp. 212, 214 (W.D. Wash. 1986) ("only the owner or the bareboat charterer of a vessel can be held liable" for unseaworthiness); *McAleer*, 57 F.3d at 115.

The Somewhere Hot was not unseaworthy. First, there is no evidence to support plaintiff's allegation of a loose or wobbly cleat. Second, plaintiff failed to show that defendants violated any binding safety regulation. Third, as to the use of gloves for line handling operations, the Court finds that while wearing gloves might have made the task safer, the lack of gloves did not render the method of work improper. The mere fact that an alternative method is available does not render a vessel unseaworthy. Lastly, a single act of operational negligence is not unseaworthiness. What caused plaintiff's injury here was not the condition of the Somewhere Hot, her equipment, or her crew, but an "isolated, personal negligent act" of Captain Fook. *Usner*, 400 U.S. at 500.[10]

Accordingly, plaintiff has failed to meet her burden to prove unseaworthiness.

**E. Maintenance and Cure**

    i.   Legal Standards

Maintenance and cure are obligations imposed on a vessel owner to provide for a seaman who becomes sick or injured during his service to the ship, irrespective of fault. *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001); *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002); *Cox v. Dravo Corp.*, 517 F.2d 620, 623 (3d Cir. 1975); *Farrell v. United States*, 336 U.S. 511, 516 (1949). "Maintenance is the living allowance for a seaman while he is ashore recovering from injury or illness. Cure is payment of medical expenses incurred in treating the

---

[10] Plaintiff presented no evidence showing Captain Fook had a pattern or practice of instructing crew members to let out the dinghy line while he was operating the vessel at a speed unsafe for that task such that it created an unseaworthy condition. *See, e.g.*, *Daughdrill v. Ocean Drilling & Expl. Co. (ODECO)*, 709 F. Supp. 710, 712 (E.D. La. 1989) (isolated acts of negligence are "not pervasive enough to constitute unseaworthiness"). Rather, the evidence indicated that, following plaintiff's injury, Captain Fook instructed charter guests to perform this same task and that they did so without incident. Plaintiff never claimed that Fook did so negligently or that she was concerned for the guests' safety, and she admitted that Fook was a good captain.

seaman's injury or illness." *Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1079 (3d Cir. 1995) (citations omitted). "Maintenance and cure is not compensatory; it is supportive and curative." *Lipari v. Mar. Overseas Corp.*, 493 F.2d 207, 210 (3d Cir. 1974).

To recover maintenance and cure, a seaman must show that "(1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *Diefenbach*, 2017 WL 1234135, at *2 (quoting *West v. Midland Enterprises, Inc.*, 227 F.3d 613, 616 (6th Cir. 2000)).[11] "Although the seaman's right of recovery for maintenance and cure is broad, . . . he still bears the burden of alleging and proving facts that bring himself within its scope." 1 Robert Force and Martin J. Norris, *The Law of Seamen* § 26:76 (5th ed. Nov. 2023 update). "[T]he seaman[] must act with reasonable diligence to ascertain the nature of his illness and his need for treatment, and he must seek the necessary treatment to correct the illness or injury." *Lipari*, 493 F.2d at 210; *Pyles v. Am. Trading & Prod. Corp.*, 372 F.2d 611, 619 (5th Cir. 1967) (seaman is not "entitled to maintenance and cure if he is not sufficiently ill or disabled as to make advisable some kind of medical attention").

"The duty to pay maintenance and cure commences when the seaman falls ill or is injured and leaves the ship," Schoenbaum, *supra*, § 6:28, "and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962). Stated another way, the shipowner is liable for maintenance and medical care until either the seaman has been cured or his incapacity has been declared permanent. *Farrell*, 336 U.S. at 517–18; *Vella v. Ford Motor Co.*, 421 U.S. 1, 5 (1975);

---

[11] "The test to determine who qualifies as a seaman entitled to maintenance and cure is identical to the test for seaman status under the Jones Act." *Diefenbach*, 2017 WL 1234135, at *2 (citation omitted).

*Smith v. Delaware Bay Launch Serv., Inc.*, 842 F. Supp. 770, 773 (D. Del. 1994), *aff'd*, 54 F.3d 770 (3d Cir. 1995). "Maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition, a determination that would be appropriate if the seaman's injury is incurable or future treatment would merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Alario v. Offshore Serv. Vessels, L.L.C.*, 477 F. App'x 186, 188 (5th Cir. 2012) (internal quotations and citation omitted).

The "determination of when a seaman has reached maximum cure is not always clear-cut." *Smith v. Delaware Bay Launch Serv., Inc.*, 972 F. Supp. 836, 848 (D. Del. 1997). That a seaman finds work on another vessel is evidence that he has fully recovered and may terminate the shipowner's maintenance and cure obligation, but is not conclusive. *Complaint of Robbins*, 575 F. Supp. 584, 587 (W.D. Wash. 1983); *see* Force & Norris, *supra*, § 26:37 ("The date when the seaman has resumed employment is often taken as the time for ending the period during which maintenance and cure may be payable. This is especially so where the seaman has left the hospital and resumed employment without any intervening convalescence period." (collecting cases)); *compare Dowdle v. Offshore Exp., Inc.*, 809 F.2d 259, at 266 (5th Cir. 1987) (seaman's reemployment in his chosen occupation terminates maintenance and cure), *and Crow v. Cooper Marine & Timberlands Corp.*, 657 F. Supp. 2d 1248, 1252 (S.D. Ala. 2009) (no obligation to pay maintenance when seaman is by his own choice employed in his accustomed trade by another vessel but has not yet reached MMI), *with Yates v. Dann*, 223 F.2d 64, 67 (3d Cir. 1955) (that seaman "was forced by financial necessity to return to his regular employment is not legally a bar to his recovery"), *and Vaughan*, 369 U.S. at 530–31 (seaman's taxi driver income could not be set off against maintenance award where he was forced to take non-seaman's work out of economic necessity); *see also Pyles*, 372 F.2d at 619 ("A seaman by voluntarily working at his accustomed

trade rather than using maintenance and cure to speed his recovery cannot by those tactics enhance the liability of the shipowner any more than the shipowner can be permitted to minimize his liability by refusing to pay and forcing the seaman back to work."); *cf. Cooper v. Diamond M Co.*, 799 F.2d 176, 179 (5th Cir. 1986) (where seaman continued to work, "albeit 'in pain,'" for years after injury, maintenance and cure claim did not accrue until she became incapacitated to do seaman's work); *Spencer v. Grand River Nav. Co.*, 644 F. App'x 559, 564 (6th Cir. 2016) (claim did not accrue until plaintiff became unfit to continue working and stopped working as a seaman, stating "that he continued working as a seaman until then negates the notion that he became incapacitated to perform seaman's work before then").

The shipowner's obligation is not without limits.  He is not required to pay for palliative treatments that only relieve pain or other symptoms but do not treat the underlying injury to improve the seaman's condition, *Vaughn v. Am. Com. Barge Line, LLC*, 672 F. Supp. 3d 184, 189 (E.D. La. 2023); *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 476 (5th Cir. 2015), nor is he required to make lifetime payments for permanent injuries.  *Smith*, 972 F. Supp. at 848; *Farrell*, 336 U.S. at 519; *see Fitzgerald v. U. S. Lines Co.*, 374 U.S. 16, 20 n.7 (1963) ("Medical expenses need not be provided beyond the point at which a seaman becomes incurable.").  Thus, while the Supreme Court has endorsed a liberal interpretation of maintenance and cure with doubts to be "resolved in favor of the seaman," *Vaughan*, 369 U.S. at 532, "it is clearly not an open-ended duty to provide food, lodging and medical care for the total duration of every illness or injury incurred while in the service of a vessel."  *Cox*, 517 F.2d at 623.  "The duty does not extend beyond the seaman's need."  *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 531 (1938).  Further, the vessel owner is entitled to "investigate and require corroboration" of a seaman's maintenance and cure claim before making any payments to the seaman.  *In re 4-K Marine, L.L.C.*, 914 F.3d 934, 938 (5th Cir. 2019)

(citation omitted).

A shipowner liable for maintenance and cure is subject to an escalating scale of liability:

> [A] shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. *If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages.* If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

*Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 177 (5th Cir. 2005) (citation omitted); *see Atl. Sounding Co.*, 557 U.S. at 424 (holding seaman is entitled to seek punitive damages for employer's "willful and wanton disregard of the maintenance and cure obligation"); *Vaughan*, 369 U.S. at 531 (where employer takes a "callous" or "recalcitrant" view of its obligations, seaman is entitled to reasonable attorney's fees for employer's "willful and persistent" refusal to pay maintenance and cure).

ii.    Analysis

At the time of her injury on July 3, 2021, Knieling was a seaman employed by Poston and working aboard the Somewhere Hot in furtherance of its mission.

Knieling claims entitlement to monthly maintenance payments retroactive to September 1, 2021, and continuing until such future time as a physician declares her to be at MMI. Knieling also seeks payment for her outstanding medical bills from 2021, 2022, and 2023, as well as payment for the treatments Dr. Fletcher recommended. She further seeks recovery of compensatory damages and attorney's fees and costs for defendants' wrongful denial of her maintenance and cure claims.

The Court finds that plaintiff has not met her burden to prove entitlement to maintenance.

Maritime law makes Poston liable for maintenance payments only to the extent that Knieling was incapacitated to do a seaman's work. *See Deisler*, 54 F.3d at 1079 (maintenance payments are to provide "the living allowance for a seaman while he is ashore recovering from injury or illness" (citing *Vaughan*, 369 U.S. at 531)). Though the parties dispute the circumstances of Knieling's departure from the Somewhere Hot, there is no evidence that she left the ship to convalesce because of her injury.

Further, the Court observes that there is no clear finding of MMI—or the absence of MMI—on this record. There is no medical evidence or testimony indicating plaintiff reached MMI in August or September of 2021, as defendants contend. Nor is there any opinion stating she was not at MMI at that time. There is also no medical testimony as to whether plaintiff reached MMI at some later time.[12] Dr. Fletcher testified that plaintiff's injury has a permanent nature and that she will never have an unpainful digit with full range of motion. Trial Tr. Day 1 [ECF 141] at 200–01, 211 (Fletcher); *see id.* at 192 (as of March 2023, his expectation was that plaintiff "would not reach normalcy, nor her full range of motion").[13] He could not determine whether MMI had been reached or not at the time of trial, and stated he could not opine on MMI without seeing plaintiff for another evaluation. Trial Tr. Day 1 [ECF 141] at 199, 226 (Fletcher). The Court concludes

---

[12] Dr. Fletcher testified that, at the time of his last appointment with plaintiff in May of 2023, she had not reached MMI because there were therapies and surgeries that could potentially improve her range of motion. Trial Tr. Day 1 [ECF 141] at 198 (Fletcher). On cross-examination, Dr. Fletcher stated he could not determine MMI at that last appointment. *Id.* at 226. He would have to exhaust all of the therapy and surgery options he recommended for plaintiff before he could determine if she was at MMI or not. *Id.*

[13] This is consistent with Dr. Fletcher's March 16, 2023 finding on exam that plaintiff had some limitation in range of motion due to pain, Trial Tr. Day 1 [ECF 141] at 192 (Fletcher) (explaining that normal is 0 to 90 degrees, and plaintiff had 10 to 80 degrees), and his May 2, 2023 examination showing identical range of motion as before, despite plaintiff receiving a joint injection at the March 16 appointment. *Id.* at 194–96 (plaintiff showed no change after medication, home therapy, and the joint injection).

from the bulk of the evidence that further treatment would be palliative as opposed to curative.[14] Plaintiff presented no evidence of any medical visits or treatment since her last appointment with Dr. Fletcher in May 2023.

The Court has considered plaintiff's subjective symptom testimony and her statements that she returned to work because she needed to pay her bills. However, plaintiff never took time off after her injury, and there is no indication that she ever gave any hint of wanting to take time off to heal. The Court does not find it credible that Captain Fook never offered for plaintiff to depart the boat and seek medical treatment. Rather, plaintiff made it clear that she wanted to keep going, and that she did not want to miss any of the scheduled charters. Plaintiff proffered no evidence that she told anyone on any of the vessels that she worked for after Somewhere Hot that she was injured or had limitations, and she provided no evidence that she missed any work or declined any positions because of her injury. Plaintiff has continued to work as a chef on vessels since her departure from the Somewhere Hot and has apparently done very well—receiving commendations for her chef skills. As such, it is not credible that she was unable to perform her job because she did. The fact that plaintiff continued to work in her accustomed trade after leaving the Somewhere Hot and is still currently doing this work negates any physical incapacity for work. Thus, no legal obligation exists for defendants to provide maintenance retroactive to September 1, 2021.

---

[14] Dr. Fletcher's testimony is speculative as to whether additional treatment could be curative. He described starting with the "least complex" treatment of medications and ointments, which "can confer some benefit" but aren't necessarily "intended to cure the issue." Trial Tr. Day 1 [ECF 141] at 186 (Fletcher). He also recommended hand therapy to improve plaintiff's pain and range of motion. *Id.* at 186–87, 189. Dr. Fletcher's recommendation for laser to improve pigmentation clearly falls outside the scope of curative treatment. He opined cortisone injections "may improve the quality of the scar" and PRP injections "might also improve the scar tissue," Ex. 64 at 211, but he gave no testimony explaining how these injections would treat plaintiff's symptoms or injury. When asked whether plaintiff may need surgery if the other treatments failed, Dr. Fletcher stated there were "a whole host of surgical options" to increase range of motion and that "surgery is a potential operation for her in the future." Trial Tr. Day 1 [ECF 141] at 189–91 (Fletcher). But he did not opine as to any specific procedure or how soon plaintiff might need it. When asked whether he would expect therapy and surgery to improve plaintiff's condition, Dr. Fletcher stated: "I would offer those to her with the hope that she will potentially improve into the future." *Id.* at 201–02.

Defendants did not, therefore, improperly deny the request for maintenance.[15]

With respect to cure, the Court finds that although plaintiff is entitled to cure for her medical bills incurred and not yet paid or reimbursed by defendants, defendants did not unreasonably deny payment of plaintiff's bills. Poston admitted to receiving several of plaintiff's maintenance and cure demands made in fall 2021. He also admitted that he was responsible to pay plaintiff's 2021 medical bills and that there were several outstanding bills that had not been paid. Poston explained that, in defendants' investigation of plaintiff's demand for cure, defendants were unable to determine the exact amount owed because the invoices did not match up with the payments. As a result, defendants offered to pay $2,000 to cover the outstanding bills, but plaintiff never responded. Then, when plaintiff filed this suit, she did not include any claim for cure. The Court therefore finds that Poston is liable for plaintiff's outstanding 2021 medical bills, but that he did not unreasonably reject plaintiff's demands for payment.[16]

The Court further finds that defendants did not unreasonably deny payment of plaintiff's 2022 and 2023 medical bills. Defendants denied payment for these bills based on their belief that, notwithstanding the later demand for cure, plaintiff achieved maximum cure in August or September of 2021, and thus was not owed any additional maintenance and cure benefits beyond that time.

---

[15] Defendants also did not unreasonably deny plaintiff's request for maintenance payments. The evidence was that plaintiff did not require any assistance to perform her chef or mate duties during her last charter with the Somewhere Hot, and that she continued to work as a chef on other vessels after leaving the Somewhere Hot. Defendants denied plaintiff's maintenance request based on their understanding that she continued to work in her chosen field following her departure from Somewhere Hot, and on their conclusion that, in light of the return to work, she achieved maximum cure in August or September 2021. Defendants thus considered plaintiff was not owed any additional benefits beyond that time.

[16] The Court does not award cure here because the Court already awarded plaintiff damages for her medical bills on the Jones Act claim. *See Butwinski*, 249 F.2d at 645 (double recovery of medical expenses not permitted).

The Court further finds that plaintiff is not entitled to cure for future medical expenses. There is no medical opinion stating plaintiff is or is not at MMI, and Dr. Fletcher testified that he would need to see plaintiff again to determine whether the treatments he previously recommended are still medically necessary.  There is also no evidence that plaintiff has scheduled these treatments or intends to do so.  Further, assuming *arguendo* that plaintiff has not already reached maximum cure, her medical expert failed to identify with any specificity when maximum cure will be achieved.  The Court will not award payments based on a hypothetical future treatment that may or may not be medically necessary and that the plaintiff may never receive.  *Calmar S.S. Corp.*, 303 U.S. at 531–32 (seaman is entitled to maintenance and cure in "such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained"); *Bonneau v. Guidance Fishing Corp.*, 919 F. Supp. 46, 48 (D. Mass. 1996) ("where a future operation is presently only a possibility, maintenance and cure cannot be 'definitely ascertained' and thus, cannot be awarded"); *Tanner v. Grand River Navigation Co., Inc.*, 2015 WL 8310291, at *6 (E.D. Mich. Dec. 9, 2015) (same).  Defendants did not, therefore, improperly or unreasonably deny plaintiff's request for payment of future medical expenses.

Finally, the Court finds that Knieling's claim for attorney's fees is without merit.  This Court previously granted summary judgment in favor of defendants on the issue of punitive damages for plaintiff's maintenance and cure claim, finding no evidence of any action by defendants that would support punitive damages.  *See* [ECF 125] at 16–18.  The evidence also does not support a finding that defendants acted with callous disregard of Knieling's legal rights or demonstrate a willful and persistent refusal to pay her maintenance and cure demands.  As noted above, defendants denied payment based on their determination that, in light of Knieling's return to work, plaintiff reached MMI in August or September 2021 and was not owed any benefits

*Knieling v. Fook et al.*
Civil No. 2022-36
Page 30

beyond that time, and also because plaintiff did not bring a claim for maintenance and cure when she filed this suit.  Further, plaintiff made it clear that she wanted to keep working on the Somewhere Hot, and presumably would have continued to do so had she not had a falling out with Captain Voris.[17]  In the absence of any request by plaintiff for time off to heal, defendants could not read her mind to determine whether her desire to keep working was only because she needed the money to pay her bills.  There is nothing arbitrary and capricious about defendants' decision to deny payment where there was a legitimate dispute about what plaintiff was owed.  Accordingly, plaintiff is not entitled to attorney's fees on this claim.

A Judgment and Order will follow.

**Dated**:  July 29, 2024                    S_____
                                                                    **RUTH MILLER**
                                                                    United States Magistrate Judge

---

[17] Plaintiff had a doctor's appointment scheduled for August 19, 2021, but chose to reschedule that appointment because it conflicted with a charter scheduled for the Somewhere Hot.  Trial Tr. Day 2 [ECF 142] at 118–19 (Knieling).